1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9

10   Viva Leroy Nash,                    )   No. CV-97-1104-PHX-MHM
                                         )
11               Petitioner,             )   <u>DEATH PENALTY CASE</u>
                                         )
12   v.                                  )
                                         )
13                                       )   **MEMORANDUM OF DECISION**
     Dora Schriro, et al.,[1]            )   **AND ORDER**
14                                       )
                 Respondents.            )
15                                       )

16

17          Petitioner Viva Leroy Nash ("Petitioner") filed a Petition for Writ of Habeas Corpus

18   alleging that he is imprisoned and sentenced to death in violation of the United States

19   Constitution. The finalized Petition raises 13 claims. (Dkt. 27.)[2] By Order dated July 17,

20   2000, the Court found that Claims 1 (in part), 6 (in part), 8 (in part), 9 (in part), 10 (in part),

21   and 13 were procedurally barred; Claims 10 (in part) and 11 were meritless; Claim 12 was

22   premature and not yet ripe for review; and Claims 1 (in part), 2, 3, 4, 5, 6 (in part), 7, 8 (in

23   part), and 9 (in part) were entitled to merit review. (Dkt. 74.) This Order addresses the

24   merits of the remaining nine claims. For the reasons stated herein, the Court finds that

25   Petitioner is not entitled to federal habeas relief.

26   _____

27          [1]       Dora Schriro, Director of the Arizona Department of Corrections, is substituted
     pursuant to Fed. R. Civ. P. 25(d)(1).

28
            [2]       "Dkt." refers to the documents in this Court's file. "R.T." refers to the court
     reporter's transcript. "R.O.A." refers to documents contained in the state court record (Case
     No. CR-130037). "M.E." refers to the minute entries of the state trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 15, 1982, Petitioner, then 67 years of age, escaped from the Utah State Prison.[3]  He traveled to Phoenix, where he answered a newspaper advertisement offering a .357 Colt revolver for sale.  Petitioner went to the home of Richard Story, the gun owner, and the two men negotiated a price for the gun.  When Story turned away to look for a cleaning kit, Petitioner loaded the gun and pointed it at Story.  Petitioner forced Story to bind himself with tape, then left Story's home with the gun.

On November 3, 1982, Petitioner entered the Moon Valley Coin Shop, where Gregory West and Susan McCullough were working.  Petitioner spoke briefly with West about purchasing some silver and gold.  Petitioner then said, "I'll take it all," and pointed a gun at West.  Petitioner shot West as West sat behind the counter.  He then pointed the gun at McCullough.  As West fell he grabbed a hidden revolver, fired at Petitioner and missed.  McCullough ducked under a desk where she heard West pleading for his life, screaming, "Please God, don't shoot me."  (R.T. 6/23/83 at 16.)  McCullough then heard additional shots.  West later died from his gunshot wounds.

As he was fleeing the scene with about $600 stolen from the coin shop, Petitioner was confronted by Jack Owens, a neighboring store owner.  The two men struggled, and Owens was shot in the hand by his own gun.  By this time, police officers had arrived and Petitioner was arrested.  He was carrying a Colt .357 revolver with three expended rounds and three live rounds.  Approximately 60 feet from the coin shop officers located a stolen Ford van with its motor still running.  Petitioner's fingerprints were found on the vehicle's door handle.

Petitioner was interviewed by Detective Jim Thomas.  Before invoking his right to counsel Petitioner identified himself as "Paul Henderson"; he told Detective Thomas that he

---

[3]      Except where otherwise indicated, this factual summary is taken from the Arizona Supreme Court opinion upholding Petitioner's conviction and sentence.  See State v. Nash, 143 Ariz. 392, 395, 694 P.2d 222, 225 (1985).

had never been in prison.  At one point Petitioner became emotional and stated, "I feel sorry for that poor bastard.  He shot at me.  I wish he would have killed me."  (R.O.A. 69, Ex. 1.)

Petitioner was indicted on one count of first degree murder, two counts of armed robbery, two counts of aggravated assault, and one count of theft.

Petitioner's public defender, Arthur G. Hazelton, initially pursued an insanity defense. In December 1982 he sought and obtained a "mental status examination" performed by Dr. Donald Tatro, Ph.D.  (R.O.A. 23, 24.)  Dr. Tatro found that Petitioner, though mentally impaired, was competent to stand trial and legally sane at the time of the murder.  (Dkt. 27, Ex. 8.)  In January 1983 counsel filed a motion for a competency hearing pursuant to Rule 11 of the Arizona Rules of Criminal Procedure.  (R.O.A. 29.)  The Court granted the motion and appointed Dr. Howard Gray, M.D., and Dr. Bruce Holzman, M.D., to examine Petitioner. (R.O.A. 32.)  Like Dr. Tatro, Drs. Gray and Holzman concluded that Petitioner was competent to stand trial and was legally sane under the *M'Naghten* standard when he killed West.  (Dkt. 27, Exs. 9, 10.)

In light of the findings of Drs. Tatro, Gray, and Holzman, the prosecution moved *in limine* to exclude psychological testimony relating to Petitioner's intent.  (R.O.A. 65.)  On the day of trial, May 25, 1983, the court granted the prosecution's motion.  The court also denied Petitioner's motion to suppress evidence, granted a motion to suppress certain statements made by Petitioner, and denied a motion for the appointment of an additional mental health expert.  (R.T. 5/25/83 at 9-16.)  Following these rulings, and despite the prosecution's stated intent to seek the death penalty, the defense agreed to waive jury trial and submit the case to the trial judge based primarily on the grand jury transcript.  After questioning Petitioner to determine if his consent to submit the case was made knowingly and intelligently, the trial judge agreed to the submission.  (Id. at 25; M.E. 5/25/83.)  The judge then took a recess and later that day announced a verdict of guilty on all counts.  (R.T. 5/25/83 at 33-34.)

A presentencing hearing took place on June 23, 1983.  The prosecution called

- 3 -

eyewitness Susan McCullough and a fingerprint expert.  Petitioner did not testify or call any witnesses, but counsel cross-examined the state's witnesses and presented written and oral arguments against the aggravating factors urged by the prosecution and in support of several mitigating factors.  (R.T. 6/23/83 at 65-74; R.O.A. 69.)  He also submitted Dr. Tatro's report regarding Petitioner's mental health.  (R.T. 6/23/83 at 51-53.)

On June 27, 1983, the court pronounced sentence.  (R.T. 6/27/83, R.O.A. 73.)  Of the seven aggravating circumstances presented by the state, the court found the following three: Petitioner had previously been convicted of other felonies in the United States involving the use or threat of violence to other persons pursuant to A.R.S. § 13-703(F)(2); in the commission of the offense, Petitioner knowingly created a grave risk of death to another person, under A.R.S. § 13-703(F)(3); and Petitioner committed the offense as consideration for the receipt, or in expectation of the receipt, of something of pecuniary value, under A.R.S. § 13-703(F)(5).  (Id.)  The court did not find any mitigating circumstances.  (Id.)  Although it found that Petitioner was mentally impaired, the court stated that the impairment was not significant enough to constitute a mitigating circumstance.  (Id.)  The court also declined to find Petitioner's old age, his commission of a felony murder, or his purported remorse to be mitigating circumstances.  (Id.)  Having found three aggravating circumstances and no mitigating circumstances, the court sentenced Petitioner to death.  (Id.)

Petitioner timely appealed his conviction and sentence.  On January 9, 1985, the Arizona Supreme Court affirmed, and a subsequent petition for certiorari in the United States Supreme Court was denied.  State v. Nash, 143 Ariz. 392, 694 P.2d 222, cert. denied, 471 U.S. 1143 (1985).

Petitioner filed a *pro se* petition for post-conviction relief ("PCR") in the state trial court in August 1985, raising eight claims.  The court appointed counsel, who filed a supplemental PCR petition in June 1986.  In August 1986, the court denied relief without holding an evidentiary hearing.  (R.O.A. 131; M.E. 8/28/86.)  Petitioner did not file a petition for review in the Arizona Supreme Court.

In May 1987 Petitioner filed his first petition for writ of habeas corpus in this Court. (U.S.D.C. Case No. CV-87-716-PHX-EHC.)  Proceedings were stayed in February 1988 to allow Petitioner to exhaust additional remedies in state court.  Petitioner filed a second PCR petition, which the trial court summarily denied, finding that each of the claims was either precluded or had been waived.  (R.O.A. 155; M.E. 11/22/88.)  Petitioner filed a petition with the Arizona Supreme Court seeking review of the denial of both his first and second PCR petitions.  On May 23, 1989, the Arizona Supreme Court struck those portions of Petitioner's petition that pertained to his first PCR proceeding and summarily denied review of those portions of the petition pertaining to the second.

Petitioner returned to federal court in September 1991 and filed a second amended petition in September 1992.  After extensive briefing on Respondents' motion for summary judgment, the parties stipulated in April 1994 to voluntary dismissal of the petition pursuant to Rule 41(a).  (CV-87-716-PHX-EHC, Dkt. 87.)  Petitioner again returned to state court and filed a third PCR petition, which the trial court denied.  (R.O.A. 205; M.E. 6/16/94.)  The Arizona Supreme Court summarily denied review on March 25, 1997.

In May 1997, Petitioner again returned to federal court.  In January 1998 he filed an amended petition for habeas corpus relief.  (Dkt. 27.)  Respondents filed an answer regarding the procedural status of Petitioner's claims, and Petitioner filed a traverse.  (Dkts. 31, 35.)  Following the Court's order of July 17, 2000, addressing the procedural status of Petitioner's claims, the parties filed supplemental merits briefs.  (Dkts. 76, 80, 82.)

## LEGAL STANDARD FOR FEDERAL HABEAS RELIEF

Because Petitioner filed his petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("AEDPA"). For properly preserved claims "adjudicated on the merits" by a state court, the AEDPA enacted a more rigorous standard for habeas relief.  See Miller-El v. Cockrell, 537 U.S. 322, 337 (2003); Lambert v. Blodgett, 393 F.3d 943, 965 (9th Cir. 2004) ("Inspired by principles of comity, finality and federalism, AEDPA establishes a highly deferential standard for

reviewing state court determinations"). Pursuant to the AEDPA, Petitioner is not entitled to relief on any claim adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA further provides that,

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

## A.    2254(d)(1)

To assess a habeas claim under § 2254(d)(1), the Court must identify the "clearly established Federal law," if any, that governs the sufficiency of the claim on habeas review. "Clearly established" federal law includes the holdings of the Supreme Court at the time the petitioner's state court conviction became final. See Williams v. Taylor, 529 U.S. 362, 390 (2000). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. See id. at 381. A state court decision is "contrary to" clearly established federal law if it failed to apply the correct controlling Supreme Court authority, or if it applied the correct authority to a case involving facts materially indistinguishable from those in a controlling Supreme Court case but nonetheless reached a different result. Id. at 413; see also Lockyer v. Andrade, 538 U.S. 63, 72 (2003); Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).

A state court decision amounts to an "unreasonable application" under § 2254(d)(1) if the state court correctly identifies the governing "clearly established" legal principle, but

then makes an objectively unreasonable application of that principle to the facts of the petitioner's case. See Andrade, 538 U.S. at 75. An "objectively unreasonable" application of federal law involves more than an incorrect or even clearly erroneous application of federal law. See Williams, 529 U.S. at 410-11 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.") The AEDPA mandates deferential review of a state court's application of clearly established Supreme Court precedent. See Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (citing Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997)).

In considering a challenge under either the "contrary to" or "unreasonable application" prong of subsection (d)(1), state court factual determinations are presumed correct pursuant to § 2254(e)(1) and can be rebutted only by clear and convincing evidence. See Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004), cert. denied, 125 S. Ct. 809 (2004).

Application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002), cert. denied, 539 U.S. 916 (2003); Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000) ("Delgado II"). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. Himes, 336 F.3d at 853 ("The 'independent review' of the *record* required when a state court supplies no *ratio decidendi* must be carefully distinguished from 'independent review' of the *constitutional question* . . . "); Pirtle, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. Pirtle, 313 F.3d at 1167 (citing Delgado II, 223 F.3d at 981-82); see also Himes, 336 F.3d at 853. Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed *de novo*, because in that circumstance "there is no state court decision on

[the] issue to which to accord deference." <u>Pirtle</u>, 313 F.3d at 1167 (following Third and Fifth Circuits); <u>see also</u> <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

**B.    2254(d)(2)**

To obtain habeas relief under subsection (d)(2), the state court factual determination at issue must be "objectively unreasonable" in light of the evidence presented in the state court proceeding. <u>Miller-El</u>, 537 U.S. at 340; <u>Davis v. Woodford</u>, 384 F.3d 628, 637-38 (9th Cir. 2004). As explained by the Ninth Circuit, the "unreasonable determination" clause,

> applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence, <u>see, e.g.,</u> <u>Wiggins v. Smith</u>, 539 U.S. 510, 123 S. Ct. 2527, 2538-39, 156 L.Ed.2d 471 (2003); <u>Ward v. Sternes</u>, 334 F.3d 696, 704-08 (7th Cir. 2003), that the process employed by the state court is defective, <u>see, e.g.,</u> <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1055-56 (9th Cir. 2003); <u>Valdez v. Cockrell</u>, 274 F.3d 941, 961-68 (5th Cir. 2001)(Dennis, J., dissenting), or that no finding was made by the state court at all, <u>see, e.g.,</u> <u>Weaver v. Thompson</u>, 197 F.3d 359, 363 (9th Cir. 1999); <u>cf.</u> <u>Wiggins</u>, 123 S. Ct. at 2539-41.

<u>Taylor</u>, 366 F.3d at 999; <u>cf.</u> <u>Norton v. Spencer</u>, 351 F.3d 1, 7 (1st Cir. 2003) (describing grounds to find state court factual determinations unreasonable under (d)(2)).

When a petitioner challenges a state court's factual findings under subsection (d)(2), a federal court must be satisfied that an appellate court could not reasonably affirm the finding. <u>Taylor</u>, 366 F.3d at 1000. "Once the state court's fact-finding process survives this intrinsic review . . . the state court's findings are dressed in a presumption of correctness, which then helps steel them against any challenge based on extrinsic evidence, *i.e.*, evidence presented for the first time in federal court." <u>Id.</u> The presumption of correctness may be overcome only by clear and convincing evidence, pursuant to § 2254(e)(1). <u>Id.</u>; <u>see</u> <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1055-56 (9th Cir. 2003), <u>cert. denied</u> 125 S. Ct. 808 (2004).

1

2

**DISCUSSION**

3

4

**Claim 1:      Petitioner was denied effective assistance of counsel at the guilt phase of his trial in violation of the Sixth and Fourteenth Amendments.**

5

6

7

8

9

10

11

12

The properly exhausted portions of this claim are that trial counsel: (A) failed to investigate and prepare Petitioner's defense; (B) failed to file notice of plausible defenses, such as self defense, lack of intent, lack of specific intent, insufficiency of the evidence, duress, presumption of innocence, and lack of proof beyond a reasonable doubt; (C) failed to secure an agreement from the prosecution not to seek the death penalty in exchange for Petitioner's submission of the case to the trial judge; and (D) improperly induced Petitioner to submit the case to the trial judge on incorrect advice that the court would not consider Petitioner's prior convictions.

13

14

15

16

17

18

19

20

As noted supra at 6–7, when a state court has addressed the merits of a petitioner's claim of federal constitutional error, a federal court may grant habeas relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); see Yarborough v. Gentry, 540 U.S. 1 (2003); Woodford, 537 U.S. at 19.  For a claim alleging ineffective assistance of counsel ("IAC"), the applicable law is that set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).

21

22

23

24

25

26

27

28

To prevail under Strickland, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense.  Id. at 687, 688.  The inquiry under Strickland is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at 689).  To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

1   A reasonable probability is a probability sufficient to undermine confidence in the outcome."

2   Strickland, 466 U.S. at 694.[4]

3        Here, Petitioner raised his IAC claims on direct appeal, and the Arizona Supreme

4   Court applied the Strickland test.  Because the state court correctly identified Strickland as

5   the governing legal rule, Petitioner cannot obtain habeas relief under the "contrary to" clause

6   of § 2254(d).  Therefore, the question presented by Petitioner is whether the Arizona

7   Supreme Court "applied Strickland to the facts of his case in an objectively unreasonable

8   manner."  Bell, 535 U.S. at 698-99.

9        In rejecting Petitioner's guilt-phase IAC claims, the Arizona Supreme Court

10  concluded that,

11

12       Admittedly, pleading guilty, pleading no contest, or submitting the case when
     the death penalty has not been waived may sometimes constitute ineffective
13   assistance of counsel requiring reversal.  Counsel, however, needs flexibility
     in representing a client.  There may be valid tactical reasons in a given case
14   why counsel would want to submit a case to the trial court.  For example, the
     defendant may be obstreperous or obnoxious, and available defense witnesses
15   may be hostile or unsavory.  Keeping such witnesses off the stand by
     submission avoids poisoning the mind of the judge for the sentencing phase.
16   Furthermore, submission avoids perpetuation of the state's witnesses

17   _____

18       [4]   In United States v. Cronic, 466 U.S. 648 (1984), the Supreme Court created an
     exception to the Strickland standard for egregious cases evidencing an actual breakdown in
19   the adversarial process at trial; in such cases, prejudice is presumed and need not be proved.
20   To the extent Petitioner argues that Cronic, rather than Strickland, provides the appropriate
     analytical framework for evaluating trial counsel's efforts, controlling case law dictates
21   otherwise.  For example, in Florida v. Nixon, 125 S. Ct. 551 (2004), the Court held that
     defense counsel's failure to obtain defendant's express consent to a strategy of conceding
22   guilt at the guilt phase of a capital trial did not automatically render counsel's performance
23   deficient.  The Court rejected the assertion that counsel's effectiveness should be evaluated
     under the per se prejudice standard of Cronic; instead, the Court applied the Strickland
24   standard and held that counsel's concession strategy in the circumstances of the case was
25   reasonable.  Nixon, 125 S. Ct. at 561-62.

26       Similarly, in United States v. Thomas, defense counsel, faced with overwhelming
     evidence, conceded his client's guilt in an effort to enhance the defendant's credibility while
27   attempting to avoid conviction on other charges.  417 F.3d 1053, 1057 (9th Cir. 2005).  The
     Ninth Circuit, citing Nixon and Cone, held that counsel's performance did not rise to the
28   level of an entire failure to subject the prosecution's case to meaningful adversarial testing,
     such that it was presumptively prejudicial.  Id.

testimony, making a possible subsequent trial more difficult for the state. Finally, submission may corroborate a theory of contrition and cooperation for sentencing.

Having decided that submission in the guilt phase is not *per se* ineffective assistance of counsel, we proceed to appellant's second ineffectiveness of counsel claim: even without a *per se* rule, does the record in this case demonstrate ineffective assistance of counsel?  In making this determination, we review not only the guilt phase but the sentencing phase of the trial.   Reviewing the record of this case, we find that appellant's ineffectiveness claim fails regarding both phases of the trial.

Prior to submission of the case, defense counsel acted reasonably under the circumstances.  He filed appropriate motions at the appropriate times.  He moved for and was granted psychiatric examinations of appellant.   He attempted to exclude prosecution evidence on fourth amendment grounds. Given the prosecution's strong case, his pursuance of the insanity defense made sense.

Furthermore, submission based almost entirely upon the grand jury testimony was not unreasonable under the circumstances.   When the psychiatric evidence showed appellant was not insane under the *M'Naughten* rule, the one feasible defense was virtually eliminated. The prosecution would present at least three key eye witnesses.  One could testify that in the course of a robbery appellant took a gun from the witness' home.  Another would testify that appellant entered the coin shop and murdered a defenseless Gregory West.  Still a third would recount how he was shot in a struggle with appellant outside the shop after the murder. Further evidence would show that appellant robbed the coin shop, that appellant stole the Ford van, and that appellant used the stolen gun in the murder.  Without an insanity defense, appellant was facing a sure conviction for first degree murder, other violent crimes, and theft.

In light of such evidence, defense counsel faced a difficult choice: go to trial and face a highly probable conviction, or submit and face sure conviction.  In this situation we cannot say that submitting was unreasonable. It gave rise to several of the tactical advantages discussed above. First, it kept strong prosecution evidence out of the record.  Thus, in the event of a retrial, the prosecution could face difficulties in reproving its case.  In addition, submission could show appellant's willingness to cooperate, a possible mitigating factor during sentencing.   Granted, these advantages appear marginal, at best, but it cannot be said that counsel was unreasonable in believing this strategy was his best choice at the time.

Nash, 143 Ariz. at 399, 694 P.2d at 229.

Regardless of counsel's performance – the factor upon which both the analysis of the Arizona Supreme Court and the arguments of Petitioner focus – Petitioner cannot meet his burden under the prejudice prong of Strickland as to any part of Claim 1.  As the Supreme Court explained, "A court need not determine whether counsel's performance was deficient

1   before examining the prejudice suffered by the defendant as a result of the alleged

2   deficiencies." <u>Strickland</u>, 466 U.S. at 697 ("if it is easier to dispose of an ineffectiveness

3   claim on the ground of lack of sufficient prejudice . . . that course should be followed");

4   <u>Smith v. Robbins,</u> 528 U.S. 259, 286 n.4 (2000); <u>United States v. Thomas</u>, 417 F.3d 1053,

5   1056 n.1 (9th Cir. 2005).

6           ***Subclaims (A) and (B):***

7           Subclaim (A) alleges that counsel failed to investigate and prepare Petitioner's

8   defense, including his insanity defense.  Subclaim (B) alleges that counsel failed to file notice

9   of plausible defenses, such as self defense, lack of intent, lack of specific intent, insufficiency

10  of the evidence, duress, presumption of innocence, and lack of proof beyond a reasonable

11  doubt.  The Court finds that Petitioner has failed to demonstrate that, absent counsel's

12  allegedly deficient performance, there was a reasonable probability "the factfinder would

13  have had a reasonable doubt respecting guilt." <u>Strickland</u>, 466 U.S. at 695.  As the Arizona

14  Supreme Court noted, the evidence of Petitioner's guilt, which included Susan McCullough's

15  eyewitness account of the shooting, was overwhelming.  <u>See Nash</u>, 143 Ariz. at 399, 694

16  P.2d at 229; <u>see also</u> <u>Eggleston v. United States</u>, 798 F.2d 374, 376 (9th Cir. 1986)

17  (observing that an "ineffective assistance claim must be considered in light of the strength

18  of the government's case").  In light of the facts surrounding the robbery and shooting, and

19  the strength of the evidence in support of those facts, there was not a reasonable probability

20  that, but for trial counsel's failure to assert alternative defenses such as duress or self-

21  defense, Petitioner would have been found not guilty.

22          Similarly, Petitioner has not shown that he was prejudiced by trial counsel's failure

23  to mount a more vigorous insanity defense.  As noted <u>supra</u> at 3, three mental health

24  professionals examined Petitioner and found that he was not insane under the *M'Naghten*

25  standard.  In support of his prejudice argument, Petitioner attached to his amended petition

26  an affidavit by Mary Durand, a private investigator and mitigation specialist. (Dkt. 27, Ex.

27  12.)  In the affidavit, dated January 23, 1998, Ms. Durand recounts Petitioner's history of

28

- 12 -

incarceration, dating back to 1931.  She notes that prison records indicate that Petitioner was committed to a mental hospital in Connecticut in 1957, was placed in a hospital in Utah in 1977 for a "sanity evaluation," with the period of the evaluation extended due to Petitioner's "inability or unwillingness to cooperate with detailed psychological or psychiatric testing," and was evaluated by a prison psychologist in 1977.  (Id. at 9-10; see dkt. 121, letter dated 8/10/77.)   Ms. Durand further states, however, that at the time of her investigation Petitioner's mental health records were no longer available.  (Id.)  While Ms. Durand speculates that these records might have existed in 1982, the absence of any evidence supporting a diagnosis different from those provided at the time of trial by Drs. Gray, Holzman, and Tatro defeats any claim that Petitioner was prejudiced by trial counsel's failure to pursue and present a more thorough insanity defense.  See Henlsey, 67 F.3d at 186-87 (counsel's failure to present an insanity defense was not prejudicial where expert testimony did not support the elements of the defense).

***Subclaims (C) and (D):***

In subclaim (C) Petitioner argues that trial counsel was ineffective in failing to attempt to secure a promise from the prosecutor not to pursue the death penalty in exchange for Petitioner's waiver of a jury trial and submission of the case on the record.  This argument is based upon two premises: first, that trial counsel did in fact fail to negotiate with the prosecutor for a plea agreement that eliminated the death penalty and, second, that the prosecutor was willing to remove the death penalty from consideration.  Although he argued some form of subclaim (C) at every stage of the state proceedings (see Appellant's Opening Br. at 12-13; R.O.A. 121 at 4-8; R.O.A. 133 at 5; R.O.A. 170 at 36-37), Petitioner has never presented any evidence in support of either of these propositions.

To the contrary, the strength of the prosecution's case and the record of Petitioner's effort to secure a plea bargain on his own supports a finding that the prosecution was not amenable to any plea agreement by which the death penalty would be eliminated as a sentencing option.  In a filing entitled "Motion for In-Chambers Discussion," dated March

15, 1983, Petitioner complained that he "has not been offered any plea bargain" and "requests [sic] practical plea agreement solution at this time by the Court." (R.O.A. 43.) The trial court denied the motion. (R.O.A. 42; M.E. 3/30/83.) Subsequently, as discussed infra at 33 n.22, Petition forwarded a letter to the Maricopa County Attorney. (R.O.A. 79, attached letter dated 4/20/83.) In the letter Petitioner wrote that counsel had informed him that the prosecutor "has declined to make any plea bargain available to me" and that "it is not your [the County Attorney's] policy to interfere in such matters." (Id. at 1.)

Petitioner's failure to establish that the prosecutor would have engaged in negotiations and accepted a plea agreement that excluded the death penalty defeats his IAC claim under the prejudice prong of Strickland. As the Tenth Circuit explained in United States v. Boone, 62 F.3d 323, 327 (10th Cir. 1995), "[w]ithout any showing that the prosecution was willing to enter plea negotiations with . . . counsel, or that such plea would have been acceptable to the court, or that the resulting sentence would have been different than that imposed under the Sentencing Guidelines, all that the Defendant urges is speculation, not a reasonable probability that the outcome would have been different."

As a final matter, the Court notes that Petitioner has not requested evidentiary development with respect to subclaim (C). (See infra at 49.) The Court finds that under § 2254(e)(2) Petitioner's failure to develop the factual basis of his IAC claim in state court bars him from receiving a federal evidentiary hearing.[5] Petitioner had an opportunity to

---

[5]        Section 2254(e)(2) of Title 28 of the U.S. Code provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
(A) the claim relies on–
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and

assert and present evidence in support of his IAC allegations during the state appellate and post-conviction proceedings; however, he did not proffer affidavits nor seek depositions establishing that counsel in fact failed to seek a plea to eliminate the death penalty as a possible punishment or that the prosecutor would have been willing to forgo pursuit of the death penalty in exchange for submitting the case to the judge.  The state court did not hold an evidentiary hearing on the matter, presumably because the court found that the allegation of ineffectiveness failed on its face to set forth a colorable claim for relief.  (R.O.A. 131; M.E. 8/28/86.)  See State v. Freeland, 176 Ariz. 544, 551, 863 P.2d 263, 270 (App. 1993) (holding that an evidentiary hearing is not warranted on a defendant's claims for PCR based on counsel's alleged ineffectiveness unless defendant asserts a colorable IAC claim, showing that counsel's performance was both deficient and prejudicial.)  The Court finds that Petitioner failed to act diligently to develop this claim in state court and that the exceptions set forth in 28 U.S.C. § 2254(e)(2) are inapplicable.  Therefore, no evidentiary hearing may be held on this claim.

In subclaim (D), Petitioner asserts that trial counsel was ineffective because he offered Petitioner inaccurate legal advice – i.e., that his prior convictions would not be considered as aggravating factors, thus reducing if not eliminating the possibility that he would receive a death sentence – which induced him to waive a jury trial and submit the case to the court. The Court disagrees and finds that Petitioner has again failed to meet his burden under the prejudice prong of Strickland.

To demonstrate prejudice where the defendant has pled guilty, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have

---

convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

[pled] guilty and would have insisted on going to trial."[6] Hill v. Lockhart, 474 U.S. 52, 59 (1985); see Lambert v. Blodgett, 393 F.3d 943, 980 (9th Cir. 2004).  As discussed in more detail infra at 29-32, the trial court record demonstrates that Petitioner was informed of the consequences of his decision to submit the case and was aware that the death penalty remained a potential sentence despite any reassurances or promises he had received to the contrary.  Because Petitioner was fully aware that his decision to submit the case did not remove the death penalty as a potential sentence, he cannot show that his decision was the product of counsel's allegedly inaccurate advice.  See Doganiere v. United States, 914 F.2d 165, 168 (9th Cir. 1990) (no prejudice results if, prior to the entry of a guilty plea, the district court "explained that the discretion as to what the sentence would be remained entirely with the court"); Shah v. United States, 878 F.2d 1156, 1159-1169 (9th Cir. 1989) (rejecting Petitioner's claim that counsel was ineffective by advising him that the court would not consider his criminal record if he pled guilty, and noting that at the plea hearing the petitioner stated that he understood that no agreements or promises regarding his sentence had been made).

17
18
19
20
21
22

     If Petitioner had proceeded to trial before a jury instead of submitting the case to the judge it is "highly probable" that he would have been convicted.  Nash, 143 Ariz. at 399, 694 P.2d at 229; cf., Hensley v. Crist, 67 F.3d 181, 184-85 (9th Cir. 1995) (finding no prejudice from defense counsel's recommendation that, for tactical reasons, the case be submitted on stipulated facts where, given the availability of state's key witness, it "was more likely than not that [the petitioner] would have been convicted had he gone to trial").

23
24
25
26

     In sum, the Court concludes that the Arizona Supreme Court's decision denying Petitioner's conviction-related IAC claims was not an unreasonable application of clearly established federal law.  See 28 U.S.C. § 2254(d)(1).  Petitioner is not entitled to habeas

27
28

---

     [6]     For the purposes of its analysis under Strickland, the Court agrees with Petitioner that the decision to submit the case to the trial court was tantamount to a guilty plea.

1  relief on any aspect of Claim 1.

2  **Claim 2:      Petitioner was denied effective assistance of counsel at the sentencing**
3  **phase of his capital trial in violation of the Sixth, Eighth, and Fourteenth**
   **Amendments.**

4          Petitioner alleges that his right to effective representation was violated by counsel's

5  failure to investigate and present available mitigating information, including evidence

6  concerning Petitioner's mental illness, character, background and family history.[7]

7          Prior to sentencing, counsel prepared a memorandum setting forth his mitigation

8  arguments.  (R.O.A. 69.)  These included mental impairment, Petitioner's advanced age, his

9  expressions of remorse and his cooperation with the authorities, and the fact that he had been

10 found guilty of felony murder.  (Id.)  Counsel repeated these arguments at the presentencing

11 hearing.  Counsel also challenged the seven aggravating factors cited by the State.  (Id.)  As

12 noted supra at 4, the court found several of these arguments persuasive.  In addition, to

13 support the assertion that Petitioner suffered from serious mental impairment, counsel

14 offered, and the court admitted, Dr. Tatro's entire 16-page report.  (R.T. 6/23/83 at 51-54.)

15 Finally, a pre-sentence report was prepared and reviewed by the trial judge.  (R.O.A. 77 at

16 4; Dkt. 27, Ex. 11 at 4.)

17         The Arizona Supreme Court determined that counsel's performance at sentencing was

18 not ineffective under the Strickland standard.  Nash, 143 Ariz. at 399, 694 P.2d at 229.  The

19 court explained:

20
21              Proceeding to the sentencing phase of the trial, we also find that counsel
                provided reasonably effective assistance to appellant.  The prosecution
22              presented much evidence of numerous aggravating circumstances.  In
                response, defense counsel made intelligent, prepared arguments. The trial
23

24  _____

25         [7]      Petitioner also claimed that counsel was ineffective because he failed to explain
    to Petitioner the law of aggravation and mitigation.  Because the Court finds that this claim
26  cannot be separated from the remainder of Petitioner's IAC claim, the Court here addresses
    only the substance of Petitioner's argument that counsel's performance at sentencing violated
27  the Strickland standard.  In its analysis of Claim 4 the Court further addresses Petitioner's
    claim that he was prejudiced by counsel's inaccurate explanation of aggravating and
28  mitigating factors.  (Supra at 29-32.)

judge, in fact, agreed with counsel's arguments respecting A.R.S. § 13-703(F)(1), (F)(6), and (F)(7). In addition, the trial court accepted counsel's arguments that appellant did not put Jack Owens in grave risk of death.

Counsel also presented sound information regarding mitigating circumstances. He offered the court a concise memorandum listing numerous mitigating circumstances. He also attached Dr. Donald Tatro's psychiatric report, which concluded that appellant suffered a mental impairment warranting leniency. Based upon these materials, counsel made competent arguments advocating a life sentence. Considering appellant's long history of violent crime and the seeming lack of evident mitigating circumstances, counsel's actions were reasonable under the circumstances. He provided reasonably effective assistance to appellant during the sentencing hearing.

Id.

The right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial." Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (quoting Clabourne v. Lewis, 64 F.3d 1373, 1378 (9th Cir. 1995)). Trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Hayes v. Woodford, 301 F.3d 1054, 1066 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 691). As the Strickland Court explained, "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. In Wiggins v. Smith, 539 U.S. 510, 534 (2003), the Court further noted that, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." Wiggins, 539 U.S. at 536 (quoting Williams, 529 U.S. at 397-98).

Petitioner's arguments are insufficient to sustain his burden under the prejudice prong of Strickland, which requires a showing that, absent trial counsel's claimed errors, the trial court or the Arizona Supreme Court would have reached a different result in their assessment

- 18 -

of the aggravating and mitigating factors.  Specifically, while Petitioner argues that trial counsel did not adequately investigate and present several categories of mitigation information, Petitioner has offered little guidance as to what sort of evidence counsel would have uncovered had he undertaken a more thorough investigation into Petitioner's mental health, character, and background.  For example, in her 1998 affidavit Ms. Durand enumerates the categories of information that competent trial counsel must review when preparing a case in mitigation, including school, employment, and social services records, as well as criminal records.  (Dkt. 27, Ex. 12 at 2-3.)  The Durand affidavit does not, however, identify any information that trial counsel failed to present to the court at sentencing.

Petitioner was 67 years old at the time of the offense and had spent more than two-thirds of his life in prison.  According to information set forth in the presentence investigation report, Petitioner grew up in a strict but functional Mormon household; he was married in 1936 and divorced eight years later.  (R.O.A. 77 at 4; Dkt. 27, Ex. 11 at 4.)  He did not wish to divulge identifying information about his wife or children.  (Id.)  The report indicated that Petitioner had no substance-abuse problems.  (Id. at 5.)  In addition, the presentence investigation contained information favorable to Petitioner, including the reporter's observations that Petitioner's psychological well-being had suffered as a result of his lengthy periods of incarceration and that he was unable to "think like a normal person." (Id.)  The report also indicated that Petitioner appeared remorseful. (Id.)

More significantly, with respect to Petitioner's psychological condition as a mitigating factor, counsel presented Dr. Tatro's report to the sentencing court for consideration.  The report offered an exceptionally sympathetic interpretation of Petitioner's mental health issues, including his claim to be in contact with and guided by various beings in a spirit

- 19 -

world, and presented a zealous case for leniency based on diminished capacity.[8]  (Dkt. 27,

Ex. 8.)  Dr. Tatro explained that, while he did not find Petitioner to be legally insane, "I do

think, however, that his mental disorder should be taken into account as a mitigating factor."[9]

(Id. at 16.)

       Dr. Tatro's report also detailed Petitioner's account of his unfortunate childhood,

during which his mother, a domineering religious fanatic, would leave him tied to a tree all

day long and would force his father to beat him every day with various implements,

including a rubber hose.  (Id. at 6-7.)  The report also included information regarding

Petitioner's traumatic experiences as a young man in prison, including being the victim of

a sexual assault.  (Id. at 8.)  The report indicated that Petitioner "was reluctant to discuss his

siblings."  (Id. at 7.)  The fact that such information was made available to the court at the

penalty phase highlights the speculative nature of any prejudice resulting from counsel's

performance.

       In addition,  a review of Ninth Circuit caselaw indicates that Petitioner has failed to

show that counsel's performance during the sentencing phase resulted in prejudice.  For

example, in Allen v. Woodford, 395 F.3d 979, 1007 (9th Cir. 2005), the Ninth Circuit held

that trial counsel's performance was deficient in failing to investigate and present potential

---

       [8]       Drs. Holzman and Gray were more skeptical about Petitioner's assertion that
his behavior was influenced by a "psychic Brain Trust."  (See dkt. 27, Ex. 9 at 5.)  As Dr.
Holzman explained, "I cannot help but raise the question concerning this elaborate system,
that it may be something which has been fabricated as a means of attempting to reduce his
culpability in this matter."  (Id. at 7.)

       [9]       Dr. Tatro examined Petitioner again in 1992; in this report he appears to
indicate regret or a lack of certainty concerning his determination, nine years earlier, that
Petitioner did not meet the definition of insanity under M'Naghten. (Dkt. 27, Ex. 7.)  Also
in 1992, a psychiatrist named Dr. Mathew Markos prepared a report based upon his review
of Petitioner's record; he concluded that Petitioner's "psychopathology" should be
considered as a mitigating factor.  (Id., Ex. 6.)  Nothing contained in these reports suggests
that trial counsel's performance at sentencing was inadequate and that a more comprehensive
investigation would have revealed additional, meaningful mitigation information.

mitigation evidence from family members and friends to the effect that "at some points in his life [the petitioner] had been nice to some people and that some people cared for him." However, the court held that counsel's failure to present such information did not prejudice the petitioner and, therefore, did not constitute IAC. Id. at 1002. According to the Allen court, there was not a reasonable probability that, had trial counsel presented such mitigation information, the jury would have weighed the evidence in favor of a life sentence rather than imposing the death penalty, after convicting the petitioner of murdering three people and conspiring to murder four others while he was already serving a life sentence for another murder. Id. at 1009. The court further noted that the neglected mitigation evidence was neither exculpatory nor "deep" or "contemporaneous" enough to humanize the petitioner for the jury. Id. at 1007. Similarly, in the present case there was not a reasonable likelihood that, if counsel had been able to uncover additional information about Petitioner's character and background, the trial court would have reached a different assessment of the aggravating and mitigating circumstances.

Significantly, the Ninth Circuit has also noted that ineffective assistance claims based on counsel's failure to investigate lack merit when the petitioner does not indicate what information further investigation would have revealed. See Pizzuto v. Arave, 280 F.3d 949, 974 (9th Cir. 2002) (petitioner failed to demonstrate prejudice from counsel's performance where he did "not show how counsel's preparation would have been different, or how different preparation would have changed the outcome of the trial" and "suggest[ed] nothing that more effective investigation would have produced"); Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001) ("speculation" about a proposed expert's testimony "is insufficient to establish prejudice"); Ceja v. Stewart, 97 F.3d 1246, 1255 (9th Cir. 1996) (petitioner "fail[ed] to explain what compelling evidence additional interviews would have unearthed").

In Ortiz v. Stewart, 149 F.3d 923 (9th Cir. 1998), the petitioner raised two claims of ineffective assistance at the penalty phase – that trial counsel failed to prepare properly for sentencing and that counsel failed to investigate mitigation information contained in the

presence report. The Ninth Circuit upheld the district court's rejection of the petitioner's arguments:

> We agree with the district court that both of Ortiz's claims of ineffective assistance at sentencing lack merit. The district court properly rejected the first claim based on Ortiz's failure to explain what counsel should have done to prepare fully for sentencing, or how his insufficient preparation prejudiced the sentencing proceeding. With respect to the second claim, the district court correctly concluded that Ortiz failed to specify what further investigation would have uncovered from the pre-sentence report. In addition, Ortiz has not shown a reasonable probability that counsel's failure to investigate the pre-sentence report affected his sentence.

Id. at 933.

Petitioner cites a number of cases in which the Ninth Circuit characterizes a failure to investigate mitigation evidence as ineffective assistance. However, these decisions stand in contrast to Petitioner's claim because the petitioners in those cases were able to identify mitigation evidence that could and should have been discovered. As the following discussion illustrates, those petitioners, unlike Petitioner here, suffered prejudice due to counsel's failure to present the court with specific, identifiable mitigation information.

For example, in Jackson v. Calderon, 211 F.3d 1148 1152, 1162-63 (9th Cir. 2000), trial counsel failed to investigate and present mitigation evidence of the petitioner's addiction to PCP and the fact that at the time of the offense he was "grossly intoxicated," as well as the fact that the petitioner had been physically abused as a child, had shown symptoms of mental illness, and had been diagnosed as schizophrenic.

In Smith v. Stewart, 140 F.3d 1263, 1268 (9th Cir. 1998), "trial counsel presented no mitigating evidence at the presentencing hearing and, more than that, he essentially presented no argument on Smith's behalf." The court determined that the petitioner was prejudiced by counsel's ineffective assistance because, as the court explained, "We now know that counsel could have, at least, pointed to Smith's sociopathic personality, his bad drug history, his change in personality after a large drug overdose, and his fine set of family relationships at the time." Id. at 1268-70.

In Correll v. Stewart, 137 F.3d 1404, 1412-13 (9th Cir. 1998), the court held that the

petitioner had alleged a colorable claim of ineffective assistance at sentencing in his capital trial.  Counsel met with Petitioner for only five minutes between the jury verdict and the presentencing hearing, presented no witnesses or evidence at the hearing, and declined to cross-examine the state's witnesses.  Id. at 1412.  The court found that the petitioner was prejudiced by counsel's "complete absence of effort" because counsel failed to argue or present significant mitigation evidence, including the petitioner's psychiatric history, which featured evidence of a three-month commitment to a mental hospital, and his condition at the time of the crimes.  Id. at 1413.

In Deutscher v. Whitley, 884 F.2d 1152, 1159 (9th Cir. 1989), vacated on other grounds by Angelone v. Deutscher, 500 U.S. 901 (1991), the court held that the petitioner was prejudiced by counsel's deficient performance in failing to investigate and present any mitigating evidence except for the argument that the petitioner "must have had some sort of mental problem."  The court determined that the petitioner was prejudiced because counsel could have presented the testimony of a psychiatrist who had examined the petitioner and would have testified that the petitioner's history was consistent with a mental disorder characterized by episodes of uncontrollable violence.  Id. at 1160-61.  This testimony would have rebutted testimony offered by the prosecution expert.  Id. at 1161.  In addition, mental health records indicated that the petitioner had been diagnosed with schizophrenia and organic brain damage, and family members were available who could have testified that the petitioner had suffered fetal injury and been born prematurely when his abusive father beat his mother.  Id.

Finally, in Hendricks v. Calderon, 70 F.3d 1032 (9th Cir. 1995), the court held that counsel's performance at the penalty phase was deficient under both prongs of Strickland.  In Hendricks, trial counsel failed to investigate or present readily available mitigation information, including evidence of mental impairment and the petitioner's "nightmarish upbringing," which included a "history of sexual and physical abuse."  Id. at 1043-44.  Significantly, counsel had developed the evidence of mental impairment during the guilt

phase; however, because the defense experts had concluded that the petitioner was sociopathic but not insane, counsel did not present evidence of the petitioner's mental health at the guilt phase *or* the penalty phase.  <u>Id.</u> at 1037, 1043-44.  The court concluded that counsel's failure to present this evidence at sentencing "sufficiently undermines confidence in the fairness of the death verdict to satisfy the prejudice prong of *Strickland*."  <u>Id.</u> at 1044.

By contrast with these cases, in which counsel prejudiced their clients by failing to identify and present significant and obvious mitigation information, Petitioner's counsel offered a relatively thorough mitigation argument, the central feature of which consisted of detailed information regarding Petitioner's mental impairment and diminished capacity.  The case for mitigation also included graphic information about Petitioner's abusive childhood and his victimization by other inmates as a youth in prison.

As the Durand affidavit suggests, the fact that counsel's mitigation efforts were limited in scope was largely the product of the nearly five decades of incarceration which preceded Petitioner's escape from prison and his murder of Mr. West.  The significance of Petitioner's character and social background as sources of additional mitigation information was compromised if not eliminated by the fact that he had spent a lifetime in institutions as punishment for serious crimes.  The Court cannot find that prejudice resulted from trial counsel's failure to present mitigation information, the existence of which is doubtful and which Petitioner himself has failed to identify.

Furthermore, in its analysis of prejudice resulting from deficient penalty-phase performance, the Ninth Circuit has discussed the distinction between "explanatory" or "exculpatory," as opposed to "humanizing," information, emphasizing the relative significance of the former as a category of mitigation evidence.  <u>See</u> <u>Allen</u>, 395 F.3d at 1005-10.  In <u>Allen</u>, the court noted that it has "rarely granted habeas relief based solely upon humanizing, rather than explanatory, mitigation evidence in the face of extensive aggravating circumstances."  <u>Id.</u> at 1006.

Here, the sentencing court had before it both explanatory and humanizing evidence

in the form of Dr. Tatro's report and the presentence report.  Petitioner has failed to identify any relevant information about his character or background that a more expansive investigation by trial counsel would have revealed.  Furthermore, while a lifetime of imprisonment had the effect of attenuating the relevance of such background information, the effect of Petitioner's decades-long institutionalization on his mental health was in fact argued at sentencing.  (R.T. 6/23/83 at 72-73.)

Because Petitioner has not identified what mitigation information was absent from the considerations of Petitioner's sentence undertaken by the trial court and the Arizona Supreme Court, a reweighing of the "evidence in aggravation against the totality of available mitigating evidence," Wiggins, 539 U.S. at 534, produces no probability of a different result. Therefore, Petitioner has failed to show that he was prejudiced by counsel's performance at the penalty phase of his trial.  The Arizona Supreme Court's denial of Petitioner's IAC claim was not an unreasonable application of clearly established federal law.  See 28 U.S.C. § 2254(d)(1).  Petitioner is not entitled to habeas relief on this claim.

**Claim 3:** **The trial court denied Petitioner the right to discharge his incompetent attorney and further denied him a hearing on his motions for change of counsel in violation of the Sixth and Fourteenth Amendments.**

Petitioner claims that the trial court erred when it denied, without holding an evidentiary hearing, Petitioner's motions seeking new counsel.  Petitioner raised this claim on appeal in a *pro se* supplemental brief (see dkt. 74 at 12), and the Arizona Supreme Court summarily denied the claims so raised as meritless, see Nash, 143 Ariz. at 407, 694 P.2d at 237.  Because the state court did not discuss its reasoning, this Court conducts a *de novo* review of the record to determine if the court's decision was an unreasonable application of clearly established Supreme Court law.  See Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002) (citing Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000)).

On March 8 and May 10, 1983, Petitioner filed motions seeking to dismiss trial counsel and replace him with one of four Phoenix-area criminal defense attorneys.  (R.O.A. 27, 42.)  Petitioner cited several grounds for his dissatisfaction with counsel.  These

complaints shared a common theme – counsel's alleged neglect of Petitioner and his case – and included the following: that counsel had not questioned a number of unnamed witnesses (65 or 12, according to Petitioner's respective filings), had not filed certain pretrial motions, had not sought the assistance of additional counsel, had failed to take action to retrieve Petitioner's eyeglasses (which were taken as evidence from the crime scene), and had failed to provide Petitioner with copies of every pleading.  (Id.)  The court denied Petitioner's motions without a hearing.  (R.O.A. 40, 67.)

Although the Sixth Amendment guarantees assistance of counsel it does not, according to the Supreme Court, guarantee a right to the counsel of one's choosing, a meaningful attorney-client relationship, or complete satisfaction with counsel's performance. See Morris v. Slappy, 461 U.S. 1, 12-15 (1983); Wheat v. United States, 486 U.S. 153, 160 (1988).  Consistent with this principle, the Ninth Circuit has held that substitution of counsel is warranted only where a defendant and counsel are "embroiled in irreconcilable conflict" that would prevent effective assistance of counsel.  Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970); see Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000).

Respondents contend that clearly established Supreme Court precedent does not support Petitioner's argument that the state court was required to hold a hearing before denying his motions for the appointment of substitute counsel.  Petitioner cites no Supreme Court case in support of that contention, and it appears that the precise issue raised by this claim is not the subject of established Supreme Court precedence.  Therefore, because this claim was addressed on the merits in state court, Petitioner is precluded from relief under the AEDPA.  See Williams, 529 U.S. at 381; cf. Kane v. Garcia Espitia, No. 04-1538, 2005 WL 2838601, (U.S. Oct. 31, 2005) (per curiam) (finding no basis for federal habeas relief where asserted right not established by existing Supreme Court caselaw).

Nonetheless, although the Court concludes that Petitioner is barred from seeking relief on this claim, an analysis of Circuit law interpreting the Supreme Court's Sixth Amendment jurisprudence indicates that Petitioner's claim lacks merit.  In support of their positions

Petitioner and Respondents both rely on the Ninth Circuit's analysis in <u>Schell v. Witek</u>.  In <u>Schell</u> the court held that a state court's failure to inquire into a defendant's request for substitute counsel, based upon a claim of "irreconcilable conflict," was not error *per se*.  218 F.3d. at 1025.  In doing so, the court enunciated the appropriate standard of review of "the constitutionality of a state court's handling of a motion to substitute appointed counsel based on allegations of an irreconcilable conflict" between counsel and client.  <u>Id.</u> at 1024.  The court explained that under § 2254 "our *only* concern when reviewing the constitutionality of a state-court conviction is whether the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'"  <u>Id.</u> at 1023-25.  The court further noted that a motion alleging an "irreconcilable conflict" must be resolved on the merits after an "appropriate inquiry into the grounds for such a motion."  <u>Id.</u> at 1025.

The Ninth Circuit found that Schell had made a sufficient showing regarding the irreconcilable, "toxic conflict" he had with his attorney and remanded the case to the district court for an evidentiary hearing.  <u>Id.</u> at 1026.  The court instructed the district court to "determine (1) the nature and extent of the conflict between Schell and his attorney, and (2) whether that conflict deprived Schell of the representation to which he was entitled by the Sixth Amendment."  <u>Id.</u> at 1025.

Respondents note that Petitioner never cited "irreconcilable conflict" as a basis for his motions for new counsel.  Petitioner contends that, while he did not use the phrase in his *pro se* filings, the presence of an "irreconcilable conflict" with counsel constituted the gravamen of his motions.  Clearly, then, the nature of Petitioner's complaints – i.e., whether, if accurate, they constituted an "irreconcilable conflict" with counsel – is the central concern. If his allegations did not satisfy that standard, then the state court's decision to deny his motions without a hearing was constitutionally unobjectionable.

In evaluating whether Petitioner adequately asserted an irreconcilable conflict with counsel, the court notes the contrast between the facts Schell set forth in his motion and the grounds cited by Petitioner.  Schell reported that a dispute with his attorney over the

fingerprint evidence – the only evidence in the case that could link him to the crime – became hostile and resulted in a breakdown of communications. Id. at 1027.  Counsel allegedly told Schell that she would not waste government money on a fingerprint expert, that he should not waste the court's time or money on a trial, and that he should accept the plea bargain.  Id.  The Ninth Circuit found that, "If true, this explanation may have been tantamount to her telling him that she would neither investigate his case nor defend him unless he pleaded guilty."  Id.  Having finally agreed to consult an expert, counsel did not share with Schell the letter containing the expert's unfavorable opinion, and became hostile when he asked to see it.  Id.  When the trial date arrived, counsel still refused to show Schell the letter, again became hostile, and would not discuss the case.  Id.  It was at this point that Schell moved for substitution of counsel.  Id.  The court found that, while addressing Schell's motion may have delayed the trial, "there is no legal excuse here for the trial court's failure to resolve the motion."  Id.

In this case, Petitioner's motions, which the trial court considered and denied, did not allege a communication breakdown or a collapse of the lawyer-client relationship. Petitioner's complaints about his attorney indicated a lack of confidence in Mr. Hazelton and a general dissatisfaction with his handling of the case.[10]  To the extent Petitioner's motions contained specific challenges to counsel's performance, including his reported failure to file certain motions and to interview a varying number of unnamed witnesses, these consisted of a disagreement as to tactics.  A defendant's disagreement with counsel's tactical decisions and trial strategy, such as that expressed by Petitioner, does not form the basis for an "irreconcilable conflict" implicating the Sixth Amendment.  See Schell, 218 F.3d at 1026 n.8; United States v. Smith, 282 F.3d 758, 763-64 (9th Cir. 2002).

---

[10]     At sentencing the trial court inquired of Petitioner, "Sir, are you in any way dissatisfied or unhappy with the services or representation provided to you by your attorney?" Petitioner did not reply in the affirmative but responded that, "I think I would have to get professional advice before I answered that." (R.T. 6/27/83 at 4.)

In fact, as noted above, the record largely refutes Petitioner's complaints. Prior to submission of the case defense counsel filed appropriate motions, including a motion seeking psychiatric examinations of Petitioner. (R.O.A. 23, 29.) He also filed a suppression motion seeking to exclude evidence located at Petitioner's residence. (R.O.A. 56.) He reviewed the police reports and the grand jury record. (R.T. 5/25/83 at 28.) He also personally interviewed all of the significant witnesses, including Mr. Story, Ms. McCullough, Mr. Owens, as well as other lay witnesses and the police officers and detectives involved in the investigation. (Id.)

Given these facts, Petitioner did not allege an irreconcilable conflict with trial counsel. Therefore, Petitioner is not entitled to habeas relief on this claim under Ninth Circuit law.

**Claim 4:** **Petitioner's waiver of his right to trial by jury was not knowing, intelligent or voluntary but the result of false and misleading promises and ineffective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments.**

Petitioner claims that erroneous advice provided by his counsel induced him to waive a jury trial and submit his case to the court. In a 1986 affidavit, Petitioner recounted an off-the-record conversation in which counsel purportedly indicated to Petitioner that he had reached an agreement with the State whereby Petitioner's prior offenses would not be used as aggravating circumstances and that, based upon this agreement, the judge would be unlikely to impose the death penalty if the case were submitted to the court instead of tried to a jury.[11] (Dkt. 27, Ex. 4.) On direct appeal, the Arizona Supreme Court found Petitioner's

---

[11]     In his affidavit, Petitioner avers that his attorney explained the advantages to Petitioner of submitting the case to the court, which would be less likely to impose the death penalty than if the case were tried to a jury because a trial by judge would not receive the same publicity. (Dkt. 27, Ex. 4 at 3.) Petitioner further stated that,

It was my understanding, based upon the information given to me by Mr. Hazelton, that the state was agreeing not to use my prior felony convictions as aggravating circumstances in support of a request that I receive the death penalty. Mr. Hazelton did not promise me that I would not receive the death penalty, but the clear implication that I received from the comments made by

claim meritless.  Nash, 143 Ariz. at 407, 694 P.2d at 237.

Although a defendant pleading not guilty pursuant to a stipulated fact trial is not entitled to all the protections that attend a guilty plea, he must enter into the stipulation with "sufficient awareness of the relevant circumstances and likely consequences."  Adams v. Peterson, 968 F.2d 835, 843-44 (9th Cir. 1992) (en banc).  Therefore, a defendant's conviction based upon stipulated facts is valid only if he voluntarily and knowingly agreed to the stipulation.  Id. at 843.  A state court's determination that a defendant knowingly, intelligently, and voluntarily waived his right to a jury trial is a factual finding that is presumed correct under § 2254(e)(1).  See Sumner v. Mata, 455 U.S. 591, 591-93 (1982); Campbell v. Blodgett, 978 F.2d 1502, 1507-08 (9th Cir. 1992) (per curiam).

The record reveals that Petitioner waived his right to a jury trial at a hearing held on May 25, 1983.[12]  Prior to discussing Petitioner's decision to submit his case, the court and parties engaged in the following discussion:

> Court: . . . it's my understanding that it is being submitted on the basis that there is no allegation of prior convictions; is that correct?
>
> Mr. Hazelton: That's right.
>
> Mr. Thurston [prosecutor]: Yes, your honor, as far as the allegation of priors go I intend to reserve them for [the] Pre-sentence Hearing.
>
> Court: You'll not be urging them not [sic] to enhance the punishment?
>
> Mr. Thurston: Not for purposes of submission, although we would desire to present them later to the Court within the same range of punishment that he is now submitting to.

(R.T. 5/25/83 at 17-18.)

---

> him was that Judge Coulter would not be able to legally impose the death penalty because he would not have any aggravating circumstances if I submitted the case to him instead of trying the case to a jury.

(Id.)  Petitioner then attested that he would not have agreed to waive a jury trial if he had known that the court could impose a death sentence.  (Id.)

[12]    Petitioner also signed a written waiver of his right to a jury trial.  (R.O.A. 66.)

- 30 -

The court then explained that, despite Petitioner's waiver of a jury trial and his decision to submit the case, "there is still the possibility of the death penalty and that I am the one that will make that determination." (Id. at 18.) Petitioner stated that he understood. (Id.) When asked, "Have any promises been made to you to get you to submit this matter to the Court without a trial by jury?", Petitioner answered, "No." (Id. at 22.) The court then reiterated:

> Whether it's a finding of guilt or innocence, or whether it's for whatever sentence might be imposed, do you understand that I am perfectly free to find you guilty or innocent as I see fit, based on whatever it is that will be submitted to me and that's my choice and my decision alone and no one else's, and if someone told you what I am going to do that that is not binding on me, and whatever penalties may be imposed within the framework of what I told you, that, again, that is something solely within my discretion; do you understand that?

Petitioner replied, "Yes." (Id. at 22-23.)

The Ninth Circuit has explained that courts attach "substantial weight to contemporaneous on-the-record statements in assessing the voluntariness of pleas." United States v. Mims, 928 F.2d 310, 313 (9th Cir. 1991). Given the prosecutor's indication that he intended to present Petitioner's prior felony convictions at the presentencing hearing, together with the judge's repeated admonitions that he alone would determine the appropriate sentence and that the death penalty remained a potential punishment, Petitioner's in-court statements that he understood the consequences of his decision to waive a jury trial support a finding that his decision was knowingly and voluntarily made.

This conclusion is further supported by the fact that Petitioner, with more than four decades of exposure to the workings of the criminal justice system, possessed the background and experience to appreciate the consequences of his decision.[13] See Parke v. Riley, 506 U.S.

---

[13]    That Petitioner was qualified to understand the legal implications of his decision – and was capable of expressing any reservations or doubts when questioned by the court – is demonstrated by his many *pro se* filings in this matter. For example, in a letter to County Attorney Tom Collins, Petitioner, attempted to convince the prosecution of the mutual benefits attendant upon a plea agreement that would spare his life while allowing the

20, 37 (1992) ("We have previously treated evidence of a defendant's prior experience with the criminal justice system as relevant to the question whether he knowingly waived constitutional rights"); Marshall v. Lonberger, 459 U.S. 422, 437 (1983) (defendant's "intelligence and experience in the criminal justice system" supported a finding that his guilty plea was knowing and voluntary); United States v. Dawson, 193 F.3d 1107, 1110 (9th Cir. 1999) (defendant's prior criminal history was a relevant factor in assessing the voluntariness of his plea).

Petitioner's affidavit is insufficient to overcome the presumption of correctness attached to the state court finding that Petitioner knowingly, intelligently, and voluntarily waived his right to a jury trial and submitted his case to the trial court. See Cuppett v. Duckworth, 8 F.3d 1132, 1139 (7th Cir. 1993) ("self-serving statements by a defendant that his conviction was constitutionally infirm are insufficient to overcome the presumption of

_____

state to avoid a costly course of litigation. (R.O.A. 79.) In the letter Petitioner described himself as "one of the most tenacious 'jailhouse lawyers' in the country" and recounted the "the 20-year-span of constant and unwavering, and to some extent devastating, legal activities" upon which he had embarked as a prisoner in Connecticut. (Id.)

Evidence of Petitioner's tenacity as a litigator is memorialized in the following reported cases: United States ex rel. Nash v. Reinecke, 418 F.2d 1333 (2d Cir. 1969) (noting "the fourth time LeRoy Nash has sought federal habeas corpus with respect to his 1947 Connecticut conviction for assaulting a police officer with intent to commit murder" and affirming the district court's denial of Petitioner's *pro se* habeas petition), cert. denied, Nash v. Reinecke, 397 U.S. 1054 (1970); Nash v. Reinecke, 240 A.2d 877 (Conn. 1968), cert. denied, 393 U.S. 884 (1968); Nash v. Reinecke, 325 F.2d 310 (2d Cir. 1963) ("This appeal is but the most recent phase of eleven years of motions and appeals which have run the gamut of all the federal and the Connecticut courts bringing Nash's claims, in various aspects, nine times before the state courts and six times before the federal courts"), cert. denied, Nash v. Warden Reinecke, Connecticut State Prison, 377 U.S. 938 (1964); Nash v. Reinecke, 212 F. Supp. 877 (D.Conn. 1962) (dismissing Petitioner's *pro se* habeas corpus petition and detailing the "tortuous course" of litigation he had pursued since his conviction); State v. Nash, 183 A.2d 275 (Conn. 1962) (rejecting Petitioner's pro se appeal), cert. denied, Nash v. Connecticut, 371 U.S. 868 (1962); Nash v. Richmond, 366 U.S. 938 (1961) (denying petition for writ of certiorari to the Second Circuit); Nash v. Cummings, 348 U.S. 930 (1955) (denying petition for writ of certiorari to Supreme Court of Errors of Connecticut).

1    regularity accorded state convictions").  In light of the record, that finding was neither

2    contrary to nor an unreasonable application of clearly established federal law, or based on

3    an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  Petitioner is not

4    entitled to habeas relief on this claim.

5

6    **Claim 5:**     **The trial court's order granting the state's motion *in limine* and**
7                       **precluding Petitioner from raising a defense deprived him of due process**
                        **of law in violation of the Sixth and Fourteenth Amendments.**
8
9           Petitioner alleges that the trial court denied him due process when it granted the state's

10   motion *in limine*, effectively precluding Petitioner from introducing any psychiatric

11   testimony in his defense at the guilt phase of his trial.  In denying this claim on direct appeal,

12   the Arizona Supreme Court addressed the use of psychiatric testimony only as a possible

13   rebuttal to a charge of intentional or premeditated murder.  Nash, 143 Ariz. at 400, 694 P.2d

14   at 230.  However, in this Court, Petitioner contends the testimony was necessary to negate

15   the specific intent element of the predicate offense of robbery.[14]  Because the Arizona

16   Supreme Court denied the claim in entirety, but did not provide any reasoning regarding the

17   use of psychiatric testimony to rebut the robbery charge, the Court reviews the record *de*

18   *novo* to determine if the decision amounted to an unreasonable application of Supreme Court

19   law.  See Pirtle, 313 F.3d at 1167.

20          A state court's procedural or evidentiary ruling is not subject to federal habeas review

21   unless the ruling violates federal law, either by infringing upon a specific federal

22   constitutional or statutory provision or by depriving the defendant of the fundamentally fair

23

---

24          [14]      Pursuant to A.R.S. § 13-1902(A), "A person commits robbery if in the course

25   of taking any property of another from his person or immediate presence and against his will,

26   such person threatens or uses force against any person with intent either to coerce surrender
     of property or to prevent resistance to such person taking or retaining property."  Further,

27   A.R.S. § 13-105(a) provides: "'Intentionally' or 'with the intent to' means, with respect to
     a result or to conduct described by a statute defining an offense, that a person's objective is

28   to cause that result or to engage in that conduct."

1   trial guaranteed by due process.  <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984); <u>see</u> <u>Estelle v.</u>
2   <u>McGuire</u>, 502 U.S. 62, 67 (1991); <u>Walters v. Maass</u>, 45 F.3d 1355, 1357 (9th Cir. 1995);
3   <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991).

4          Respondents contend that because Dr. Tatro could not testify that Petitioner met the
5   legal definition of insanity at the time of the crime, his testimony would constitute evidence
6   of Petitioner's "diminished capacity," a defense which the State of Arizona has legitimately
7   precluded.   At the time of Petitioner's trial, Arizona had adopted the *M'Naghten* test
8   regarding legal insanity "as the sole standard for criminal responsibility."  <u>State v. Ramos</u>,
9   133 Ariz. 4, 6, 648 P.2d 119, 121 (1982) (internal quotation marks omitted).  Arizona had
10  also rejected the affirmative defense of diminished capacity.  <u>See</u> <u>State v. Mott</u>, 187 Ariz.
11  536, 541, 931 P.2d 1046, 1051 (1997) ("Because the legislature has not provided for a
12  diminished capacity defense, we have since consistently refused to allow psychiatric
13  testimony to negate specific intent."); <u>Clark v. Arizona</u>, --- S. Ct. ----, 2006 WL 1764372 *21
14  (2006) (upholding the constitutionality of the <u>Mott</u> rule, explaining that the exclusion of
15  expert testimony regarding diminished capacity is not violative of due process).

16         The trial court's decision to exclude Dr. Tatro's testimony was proper.  Dr. Tatro's
17  testimony, as characterized by Petitioner, would have constituted evidence of diminished
18  capacity relating to the specific intent element of the predicate offense.  As such, it was
19  inadmissible under Arizona law.

20         Moreover, even assuming that such evidence were admissible, Petitioner's contention
21  that Dr. Tatro could have offered testimony to negate the intent element of the robbery
22  offense is not credible.  Nothing in the record, including Dr. Tatro's report, indicates that
23  Petitioner lacked the intent, or the capacity to form the intent, to commit robbery.  In fact, the
24  record supports the opposite conclusion, namely that Petitioner's actions in carrying out the
25  offenses "indicate that he had prepared carefully and anticipated most possible events in the
26  commission of his attempted robbery."  (Dkt. 27, Ex. 9 at 7.)

27         The Arizona Supreme Court's decision affirming the trial court's exclusion of

1   testimony regarding Petitioner's diminished capacity or ability to form specific intent was

2   neither contrary to nor an unreasonable application of clearly established federal law.  See

3   28 U.S.C. § 2254(d)(1).  Petitioner is not entitled to habeas relief on this claim.

4

5

6   **Claim 6:**      **Petitioner was denied due process of law as guaranteed by the Sixth and**
7                     **Fourteenth Amendments and a fair sentencing as required by the Eighth**
                      **Amendment by the denial of expert psychiatric assistance.**
8
9        Petitioner alleges that his rights to due process and a fair sentencing were violated

10  when the trial court denied him the type of expert psychiatric assistance required pursuant

11  to Ake v. Oklahoma, 470 U.S. 68 (1985).[15]  Under Ake,

12       when a defendant demonstrates to the trial judge that his sanity at the time of
         the offense is to be a significant factor at trial, the State must, at a minimum,
13       assure the defendant access to a competent psychiatrist who will conduct an
         appropriate examination and assist in evaluation, preparation, and presentation
14       of the defense.

15  Id. at 83.

16       However, as the Ninth Circuit noted in Gretzler v. Stewart, 112 F.3d 992, 1001 (9th

17

18       [15]    On April 5, 1985, Petitioner filed a *pro se* "Motion that the Court Order a
    Bonafide and Lawful Psychiatric Examination of Accused," in which he requested that the
19  court issue an order directing that:

20       the accused be given another psychiatric examination, by doctors who have not
21       been, and will not be, made prejudice [sic] against the accused, to his
         detriment, as happened by the illegal acts of the State to the first two doctors,
22       who only conducted a perfunctory, quickie examination, obviously, by their
         own statements, relying to some admitted extent, on the illegal material
23       unlawfully procured by the overzealous prosecution, condoned by ineffective
24       defense counsel.

25

26  (R.O.A. 44 at 3.)  The court denied the motion.  Petitioner repeated his request for an
    additional mental health examination in a filing entitled "Defendant Claims Rights, Motions"
27  on May 10, 1983.  (R.O.A. 61.)  Petitioner then presented the essential elements of Claim 6
    in his *pro se* supplemental direct appeal brief.  The Arizona Supreme Court summarily
28  denied the claim.  Nash, 143 Ariz. at 402, 694 P.2d at 237.  Therefore, the Court performs
    an independent review of the record.

- 35 -

1    Cir. 1997), "Ake makes clear that psychiatric assistance is a contingent, not an absolute,

2    right: it holds that *when a defendant has made a preliminary showing* that his sanity at the

3    time of the offense is likely to be a significant factor at trial the state must provide psychiatric

4    assistance." Id. (citing Williams v. Calderon, 52 F.3d 1465, 1473 (9th Cir.1995) (citation and

5    internal quotation omitted). Citing Gretzler, Respondents contend that Petitioner never made

6    the requisite preliminary showing that his sanity would be a significant issue at trial.

7        As noted above, three experts, including Dr. Tatro, a clinical psychologist whose

8    services Petitioner sought and obtained, and two court-appointed psychiatrists who

9    performed a competency examination at Petitioner's request, examined Petitioner and found

10   that he was competent to stand trial and was legally sane at the time of the offenses.

11   Petitioner alleges that these examinations failed to satisfy Ake's requirement that the Court

12   appoint, in Petitioner's phrase, an "advocate in his psychiatric expert, not a neutral agent of

13   the state."  (Dkt. 76 at 35-36.)

14

15       The Ninth Circuit addressed a similar scenario in Gretzler.  There, the trial court

16   refused to appoint an additional psychiatric expert for a capital defendant after two

17   previously-appointed experts, one of whom was selected by the defendant, had determined

18   pursuant to a Rule 11 examination that the defendant was sane at the time of the crime and

19   competent to stand trial.  Gretzler, 112 F.3d at 1001-02.  The Ninth Circuit upheld the trial

20   court's decision, explaining that the defendant's constitutional rights were not violated

21   because the defendant had failed to show that his sanity was likely to be an issue at trial.[16]

22   Id.

23       Like the trial court in Gretzler, the court here "did not simply reject [Petitioner's]

24   request for the assistance of a psychiatric expert."  Id.  Rather, it reached its decision not to

25   appoint an additional expert only after a determination had been made – by a psychologist

26

27

28       [16]    While the Gretzler court found that the rule announced in Ake was not
     retroactive and, therefore, did not apply to Gretzler's habeas petition, the court also explained
     that, "even if Ake applied, it would be of no help to Gretzler."  112 F.3d at 1000.

and two psychiatrists, the former of whom was selected by Petitioner – that Petitioner was sane at the time of the offense.  Like Gretzler, Petitioner failed to make a preliminary showing that his sanity was likely to be an issue.  Therefore, the court did not violate Petitioner's Sixth Amendment rights under Ake by refusing to appoint a fourth expert to assist Petitioner in his defense.

Petitioner also asserts that the trial court's refusal to appoint an independent psychiatric expert violated his rights under Ake at sentencing.  In Ake the Court explained that the right of access to a competent psychiatrist applies "in the context of a capital sentencing proceeding, when the State presents evidence of the defendant's future dangerousness." 470 U.S. at 83.  In this case, the State did not allege future dangerousness as an aggravating factor at Petitioner's sentencing hearing and presented no evidence in aggravation regarding Petitioner's mental state.  At the presentencing hearing, Petitioner offered, and the court admitted, Dr. Tatro's full report, and the state offered in rebuttal the reports of Drs. Gray and Holzman.  Therefore, the trial court was presented with and considered Petitioner's mental health as a potential mitigating factor.  Having done so, the court concluded:

> The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired but not significantly impaired to the extent that it would constitute a mitigating circumstance and not so impaired as to constitute a defense to the prosecution.

(R.T. 6/27/83 at 8; R.O.A. 52a.)

Based upon its independent review of the record, this Court rejects Petitioner's claim that his rights under Ake were violated at the sentencing phase.  Because the record demonstrates that the trial court considered as a mitigating circumstance evidence that Petitioner suffered from mental impairment, and because the state produced no psychological evidence which needed to be rebutted by the testimony of another expert, the Arizona Supreme Court's decision to deny Petitioner's Ake claim was not an objectively unreasonable application of federal law.  Therefore, Petitioner is not entitled to habeas relief on this claim.

**Claim 7:**   **Petitioner was sentenced to death based upon an improper aggravating factor, A.R.S. § 13-703(F)(2), in violation of the Sixth, Eighth, and Fourteenth Amendments.**

The trial court sentenced Petitioner to death pursuant to A.R.S. § 13-703(E), which provides that,

> In determining whether to impose a sentence of death or life imprisonment, the trier of fact shall take into account the aggravating and mitigating circumstances that have been proven. The trier of fact shall impose a sentence of death if the trier of fact finds one or more of the aggravating circumstances enumerated in subsection F of this section and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency.

See State v. Ross, 180 Ariz. 598, 605, 886 P.2d 1354, 1361 (Ariz. 1994) ("If the trial court finds one or more aggravating circumstances and no mitigating circumstances sufficient to call for leniency, it must sentence the defendant to death").  As noted supra at 4, the trial court found three of the aggravating circumstances listed in subsection (F).  Petitioner challenges the validity of each of these aggravating circumstances, in Claims 7, 8 and 9.  For the reasons set forth below, the Court finds that each of these aggravating factors was valid and properly applied by the trial court and the Arizona Supreme Court.[17]

In Claim 7, Petitioner alleges that the trial court improperly failed to consider the statutory definitions of Petitioner's prior felonies when deciding the applicability of the aggravating circumstance set forth in A.R.S. § 13-703(F)(2).  Further, Petitioner asserts that

---

[17]       After finding that three aggravating factors were present the trial court and the Arizona Supreme Court determined that there were no mitigating factors sufficient to call for leniency.  Consequently, this Court finds that the elimination of any one of the three aggravating circumstances would not have shifted the balance in favor of leniency.  See State v. Bible, 175 Ariz. 549, 609, 858 P.2d 1152, 1212 (Ariz. 1993) (where two of three aggravating factors remained and the mitigation evidence was "de minimis" there was "simply nothing to weigh or balance"); State v. Carreon, 210 Ariz. 54, 73-74, 107 P.3d 900, 919-20 (2005) (accord), cert. denied, Carreon v. Arizona, 126 S. Ct. 122 (2005); cf. Barclay, 463 U.S. 939, 967-68 (1983) (Stevens, J., concurring in the judgment) ("Under Florida law, if there are no statutory mitigating circumstances, one valid statutory aggravating circumstance will generally suffice to uphold a death sentence on appeal even if other aggravating circumstances are not valid. The Federal Constitution requires no more, at least as long as none of the invalid aggravating circumstances is supported by erroneous or misleading information").

there was insufficient evidence of his prior convictions to support the (F)(2) finding. Petitioner also claims that the trial court erred in considering his 1936 Utah conviction, which he contends was obtained pursuant to an "uncounselled" guilty plea.  Finally, Petitioner claims that evidence introduced to support the existence of the prior convictions was admitted in violation of state evidentiary rules.  For the reasons set forth below, the Court finds that Petitioner's arguments are without merit.

At the time of Petitioner's crime, A.R.S. § 13-703(F)(2) provided that the sentencing court must consider it an aggravating circumstance if "[t]he defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person."  The Arizona courts define "violence" as the "exertion of any physical force so as to injure or abuse."  State v. Arnett, 119 Ariz. 38, 51, 579 P.2d 542, 555 (1978).

To apply this aggravating factor, the sentencer must look only to the statutory definition of the previous offense.  State v. Gillies, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983).  Thus, the pertinent issue is whether the felony offense by definition involved violence, not whether the defendant actually committed the felony in a violent manner.  Id. Moreover, the offense must be one that, by definition, could have been committed only knowingly or intentionally.  State v. McKinney, 185 Ariz. 567, 581, 917 P.2d 1214, 1228 (1996).  If the offense could have been committed recklessly, it does not satisfy the aggravating circumstance, regardless of the mental state actually used to commit the crime. Id.

At the sentencing hearing the state presented evidence of three prior felony convictions: (1) robbery in Utah in 1936, which resulted in a sentence of five years to life; (2) assault with intent to murder, under "Sec. 6049" in Connecticut in 1947, with a sentence of 25-30 years; and (3) aggravated robbery and second-degree murder, both "first-degree

felonies," in Utah in 1978, with consecutive sentences of five years to life.[18]  The trial court

found that these convictions constituted an aggravating factor pursuant to § 13-703(F)(2).

(R.T. 6/27/83 at 7; R.O.A. 52.)

        In performing its independent review of the record to determine the existence of

aggravating and mitigating factors, the Arizona Supreme Court took "judicial notice that, by

definition, all three of [Petitioner's] prior convictions were violent felonies committed

against other persons" for the purposes of § 13-703(F)(2). Nash, 143 Ariz. at 404, 694 P.2d

at 234; see Poland v. Stewart, 169 F.3d 573, 589 (9th Cir. 1999) (citing Nash in rejecting

defendant's argument that "absent an examination of whether violence played a role" the trial

court should not have considered his prior bank robbery conviction as an aggravating factor).

The court also found that the prosecution submitted sufficient evidence to prove the prior

convictions.  Nash, 143 Ariz. at 402-03, 694 P.2d at 232-33 (citing State v. Baca, 102 Ariz.

83, 87, 425 P.2d 108, 112 (1967) (finding a certified copy of the defendant's record of

commitment, which included a photograph and fingerprint card, sufficient evidence to

---

        [18]        The prosecution presented evidence in the form of prison records from Utah
and Connecticut.  (See Dkt. 80, Exs. A-D; dkt 121.)  The Connecticut records relating to the
1947 assault include a set of photographs, a "Record of Court Commitment," and a "State
Prison Warrant."  The records set forth Petitioner's crime and sentence.  (A set of fingerprints
exists in the Connecticut records, however, they appear in connection with a later escape
conviction.)  The Utah records refer to two robbery convictions and a second-degree murder
conviction.  The 1936 record contains a one-page copy of a document from the Utah State
Prison, which lists Petitioner's name, contains his photograph, states that he was convicted
of robbery, and indicates that he received a sentence of five years to life.  The record also
states that Petitioner was received at the prison on February 4, 1936, and released on parole
March 1, 1946.  The 1978 records include a certified copy of a judgment and commitment
sentencing Petitioner to the Utah State Prison for aggravated robbery and second-degree
murder.  The records also contain certified photographs and a commitment record from the
Utah State Prison, specifying Petitioner's crimes and sentences.  Finally, the records contain
a copy of a fingerprint card made after the 1978 crimes.  At the presentencing hearing, a
fingerprint expert linked Petitioner to both the Connecticut and Utah records.  (R.T. 6/23/83
at 38-39.)

1   support a finding of prior felony conviction)).

2       In Lewis v. Jeffers, 497 U.S. 764, 781 (1990), the Supreme Court held that the

3   appropriate standard of federal habeas review of a state court's application of an aggravating

4   circumstance is the "rational factfinder" standard; i.e., "whether, after viewing the evidence

5   in the light most favorable to the prosecution, any rational trier of fact could have found" the

6   aggravating factor to exist.  Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

7   Before reaching Petitioner's other arguments, the Court first resolves Petitioner's claim of

8   insufficiency of the evidence by applying the Jeffers standard to the three convictions used

9   as a basis for the (F)(2) factor.

10      Regarding Petitioner's 1936 robbery conviction, the record presented by the state

11  indicates that Petitioner was charged with and pled guilty to robbery. (Dkt. 80, Exhibit C;

12  dkt. 121.)  By statutory definition the offense of robbery consisted of "the felonious taking

13  or personal property in the possession of another, from his person, or immediate presence,

14  and against his will, accomplished by means of *force or fear*."  Comp. Laws Utah 1917,

15  § 8043; see Utah Code Annotated, 1943, 103-49-1 (emphasis added).  From this presentation

16  of the offense, which by definition involves the use of "force or fear," it is clear that

17  Petitioner's conviction qualified as a "felony in the United States involving the use or threat

18  of violence on another person" under § 13-703(F)(2).

19      With respect to the 1947 conviction for "assault with intent to murder," the records

20  submitted by the state at the sentencing hearing referred to a violation of Connecticut statute

21  section 6049.[19]  By its definition, that offense included the element of intent.

22      Petitioner's final felony conviction, for aggravated robbery and second-degree murder,

23  also satisfies § 13-703(F)(2).  Under the relevant Utah statutes, aggravated robbery is by

---

[19]     Section 6049 ("Attempt to murder by assault or poison"), provided, in relevant part, that, "[a]ny person who shall assault another with *intent* to commit murder . . . shall be imprisoned in the State Prison not more than thirty years." Conn. Gen. Stat. § 6049 (emphasis added).  Elsewhere the record clarifies that Petitioner was convicted under the "assault," rather than the "poison," provision of § 6049.

definition an offense involving violence or the threat of violence.[20]   Based upon the information presented by the State, a "rational factfinder" could have determined that the state proved this aggravating factor as to each of the prior convictions.  Jeffers, 497 U.S. at 781.

Petitioner next challenges the fact that the state did not present copies of the statutes to the state court, thereby not meeting its burden of proof that the convictions were for crimes of violence.  Again, this Court finds that, based upon the record presented to the trial court and the statutory definition of the offenses, a reasonable fact finder could have determined that each of Petitioner's prior convictions was for a crime of violence as required by § 13-703(F)(2).

Petitioner further argues that his attorney during the 1936 prosecution, Mr. Grant Iverson, was operating under a conflict of interest because he represented both Petitioner and Petitioner's younger brother, a co-defendant in the same offense; according to Petitioner, this conflict of interest deprived him of representation by counsel.  However, as Respondents note, Petitioner has failed to meet his burden of "demonstrat[ing] that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980); see Mickens v. Taylor, 535 U.S. 162, 171 (2002) (an "actual conflict" is "a conflict *that affected counsel's performance* – as opposed to a mere theoretical division of loyalties")

---

[20]     Pursuant to U.C.A. § 76-6-301:

(1) A person commits robbery if:
(a) the person unlawfully and *intentionally* takes or attempts to take personal property in the possession of another from his person, or immediate presence, against his will, *by means of force or fear*, and with a purpose or intent to deprive the person permanently or temporarily of the personal property; or
(b) the person *intentionally or knowingly* uses force or fear of immediate force against another in the course of committing a theft or wrongful appropriation.

A robbery is "aggravated" if during its commission a person "uses or threatens to use a dangerous weapon or causes serious bodily injury upon another person." U.C.A. § 76-6-302.

- 42 -

1   (emphasis in original); <u>United States v. Rodrigues</u>, 347 F.3d 818, 823 (9th Cir. 2003).

2   Petitioner has suggested nothing beyond the possibility that Mr. Iverson's loyalties were

3   divided.[21]

4       With respect to Petitioner's assertion that the trial court's admission of the prior

5   convictions was erroneous under state evidentiary law, the Court reiterates that, "it is not the

6   province of a federal habeas court to reexamine state-court determinations on state-law

7   questions." <u>Estelle v. McGuire</u>, 502 U.S. at 67 (federal court's habeas powers do not allow

8   it to grant relief simply because it believes the trial court incorrectly interpreted the rules of

9   evidence).  In conducting habeas review, a federal court is limited to deciding whether a

10  conviction violated the Constitution or laws of the United States.  <u>Id.</u>  Therefore, the federal

11  court must only determine whether the alleged error of state law "so infused the proceeding

12  with unfairness as to deny due process of law."  <u>Id.</u> at 75; <u>see</u> <u>Jammal</u>, 926 F.2d at 920 ("The

13  issue is not whether introduction of [the evidence] violated state evidentiary principles, but

14  whether the trial court committed an error which rendered the trial so arbitrary and

15  fundamentally unfair that it violated federal due process") (quoting <u>Reiger v. Christensen</u>,

16  789 F.2d 1425, 1430 (9th Cir. 1986)).

17

18      Here, even if the trial court erred in its admission of the records of Petitioner's prior

19  felony convictions, the Court finds that the error did not deny Petitioner due process of the

20  law or render the proceedings fundamentally unfair.[22]  The fact that the trial court reviewed

21

22  _____

23      [21]    As evidence that Mr. Iverson had a conflict of interest, Petitioner relies entirely
    on the fact that he received a much harsher sentence than his brother, whose sentence was
24  suspended and who was placed on probation. (Dkt. 76 at 41-42.)  However, the basis of the
    disparity in sentences may be explained by Petitioner's dominant role in the crime and by the
25  fact that he had a previous conviction for a violation of the Dyer Act, which led to a sentence
    in a federal reformatory, from which Petitioner escaped. (Dkt. 121, Investigator's Report
26  dated 1/20/36.)

27

28      [22]    Furthermore, in assessing the admissibility of evidence regarding a defendant's
    prior convictions, Arizona courts have upheld the admission of information similar to that
    admitted by the trial court in this matter.  <u>See</u> <u>State v. Dixon</u>,127 Ariz. 554, 558,  622 P.2d

documentary evidence, the authenticity and import of which were not subject to reasonable dispute, did not "violate 'fundamental conceptions of justice.'" Dowling v. United States, 493 U.S. 342, 352 (1990) (defining the "category of infractions that violate 'fundamental fairness' very narrowly") (citing United States v. Lovasco, 431 U.S. 783, 790 (1977)). The trial court and the Arizona Supreme Court reasonably determined that the three convictions presented by the state constituted prior felonies involving violence and constituted an aggravating factor pursuant to § 13-703(F)(2).

Finally, this Court notes that the trial court found three prior felony convictions, while only one conviction is necessary to satisfy § 13-703(F)(2). See State v. Ramirez, 178 Ariz. 116, 130, 871 P.2d 237, 251 (1994) (one of two prior convictions, "standing alone, is sufficient to support the court's finding of an aggravated circumstance under § 13-703(F)(2)").

For the reasons set forth above, Petitioner is not entitled to habeas relief on this claim.

**Claim 8:** **Petitioner was sentenced to death based upon an aggravating factor, A.R.S. § 13-703(F)(5), which was not found to exist beyond a reasonable doubt, which is vague and arbitrary, and which resulted in double counting an element of the crime in violation of the Eighth and Fourteenth Amendments.**

Petitioner alleges that the trial court failed to find that the pecuniary gain aggravating factor, as set forth in A.R.S. § 13-703(F)(5), existed beyond a reasonable doubt.[23] He also alleges that the (F)(5) aggravating circumstance is unconstitutionally vague and arbitrary. Finally, he claims that the trial court and the Arizona Supreme Court improperly double counted the pecuniary gain aggravating circumstance.

---

501, 506 (App. 1980) (finding a "package record," including a judgment and commitment order, a fingerprint record, and a photograph, properly admitted and that it stood as prima facie evidence of the facts it contained).

[23]     Arizona Revised Statutes Section 13-703(F)(5) provides that the court shall consider the following as an aggravating factor when determining whether to impose a sentence of death: "The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

- 44 -

Petitioner argues that neither the trial court nor the Arizona Supreme Court explicitly applied the reasonable doubt standard to the pecuniary gain aggravating factor. Petitioner's argument fails on two grounds. First, because a trial judge is presumed to have applied the proper standard, the judge "is not required to state on the record that he or she found the factors beyond a reasonable doubt." State v. Beaty, 158 Ariz. 232, 245, 762 P.2d 519, 532 (1988); see State v. Jordan, 126 Ariz. 283, 286, 614 P.2d 825, 828 (1980); Beaty v. Stewart, 303 F.3d 975, 986 (9th Cir. 2002); Ceja v. Stewart, 97 F.3d 1246, 1250 (9th Cir. 1996). Further, in all death penalty cases, the Supreme Court independently reviews the record to determine whether the state proved the aggravating factors beyond a reasonable doubt. State v. Runningeagle, 176 Ariz. 59, 64, 859 P.2d 169, 174 (1993); State v. Greenway, 170 Ariz. 155, 160, 823 P.2d 22, 30 (1991). Therefore, in reviewing Petitioner's conviction, the Arizona Supreme Court applied the reasonable doubt standard in considering the pecuniary gain factor. Nash, 143 Ariz. at 405-06, 694 P.2d at 235-36. The court found that the facts forming the basis of Petitioner's conviction "show a plan to rob and a murder which furthered that plan." Id. This finding plainly comports with a constitutionally acceptable application of § 13-703(F)(5).[24]

The Ninth Circuit has expressly rejected the argument that § 13-703(F)(5) is unconstitutionally vague. Poland v. Stewart, 117 F.3d 1094, 1098-1100 (9th Cir. 1997); Woratzeck v. Stewart, 97 F.3d 329, 334-35 (9th Cir. 1996). As the Woratzeck court explained, factor (F)(5) is constitutionally permissible because it "is not automatically applicable to someone convicted of robbery felony-murder"; the factor therefore "serves to narrow the class of death-eligible persons sufficiently." 97 F.3d at 334. Moreover, as the Arizona Supreme Court noted in Nash, the pecuniary gain aggravating circumstance "does

---

[24] To the extent that Petitioner challenges the sufficiency of the evidence in support of this factor (see dkt. 27 at 45), the Court concludes that a rational fact-finder could have found that Petitioner committed the murder with the expectation of pecuniary gain. Jeffers, 497 U.S. at 781.

not apply in every situation where an individual has been killed while at the same time the defendant has made a financial gain. It is limited to those situations where 'the defendant committed the offense . . . in the expectation of the receipt of anything of pecuniary value.'" 143 Ariz. at 405, 694 P.2d at 235 (quoting State v. Hensley, 142 Ariz. 598, 603, 691 P.2d 689, 695 (1984)).

In addition, the Arizona Supreme Court and the Ninth Circuit have addressed and rejected the argument that § 13-703(F)(5) impermissibly allows the pecuniary gain factor to be counted both as an element of the underlying robbery offense and an aggravating circumstance at sentencing. The Arizona Supreme Court has explained that the "facts necessary to prove a taking of property are not the same facts necessary to prove the motive for murder. Thus, there is no double-counting of an element of robbery when the State proves pecuniary gain as an aggravating factor." Greenway, 170 Ariz. at 164, 823 P.2d at 31; see State v. Carriger, 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984) ("the state must prove additional facts to prove the aggravating circumstance of pecuniary gain once it has proved the robbery"). The Ninth Circuit, citing Greenway, has similarly held that the (F)(5) factor does not result in double-counting because not every felony murder that occurs in the course of a robbery is motivated by pecuniary gain; therefore, the motivation of pecuniary gain must be proven as a fact in addition to the elements of the underlying crime. Woratzeck, 97 F.3d at 334-35.

For the reasons set forth above, the findings of the trial court and the Arizona Supreme Court as to A.R.S. § 13-703(F)(5) do not constitute an unreasonable application of federal law under § 2254(d)(1). Petitioner is not entitled to habeas relief on this claim.

**Claim 9:    Petitioner was sentenced to death based upon an aggravating factor, A.R.S. § 13-703(F)(3), which was not found to exist beyond a reasonable doubt in violation of the Eighth and Fourteenth Amendments.**

Petitioner alleges that both the trial court and the Arizona Supreme Court failed to find that the aggravating circumstance set forth in A.R.S. § 13-703(F)(3) (grave risk of death to another person) existed beyond a reasonable doubt, in violation of the Eighth and Fourteenth

1   Amendments.

2        As noted supra at 45, the trial court is presumed to have applied the proper standard

3   of proof in its consideration of an aggravating circumstance, see Beaty, 158 Ariz. at 245, 762

4   P.2d at 532, and the Arizona Supreme Court also undertakes an independent analysis

5   employing the beyond-a-reasonable-doubt standard, see Runningeagle, 176 Ariz. at 64, 859

6   P.2d at 174.  In addressing factor (F)(3) the Arizona Supreme Court found that Petitioner

7   "put Susan McCullough in the zone of danger during his murder of Gregory West."  Nash,

8   143 Ariz. at 405, 694 P.2d at 235.  The court explained that by firing three shots in the

9   vicinity and pointing the murder weapon at her, Petitioner placed Ms. McCullough at "grave

10  risk of death."[25]  Id.

11

12       In addition to challenging the standard of proof used by the trial court and the state

13  supreme court, Petitioner asserts that the facts of the case prohibit a finding that Ms.

14  McCullough was placed in a grave risk of death for the purpose of § 13-703(F)(3).  He

15  argues that because Ms. McCullough was an intended victim of the crime of robbery, the

16  grave risk of death factor cannot apply.  While Petitioner correctly outlines the applicable

17  legal principle, the cases upon which his argument relies, in which the court found that the

18  (F)(3) factor was not applicable, are distinguishable from the facts surrounding the killing

19  of Mr. West in the presence of Ms. McCullough.

20       The aggravating circumstance set forth in § 13-703(F)(3) provides that the sentencing

21  court must consider it an aggravating circumstance if "[i]n the commission of the offense the

22  defendant knowingly created a grave risk of death to another person or persons in addition

23  to the victim of the offense."  A.R.S. § 13-703(F)(3).  Therefore, for the factor to apply, the

24  person so endangered must not have been an intended victim of the crime.  State v. Fierro,

25  166 Ariz. 539, 551, 804 P.2d 72, 84 (1990); see State v. Johnson, 147 Ariz. 395, 400, 710

26  P.2d 1050, 1055 (1985); State v. Rossi, 146 Ariz. 359, 366, 706 P.2d 371, 378 (1985).

27

28          [25]    At the presentencing hearing Ms. McCullough testified that Petitioner was
        approximately five feet away when he pointed the gun at her.  (R.T. 6/23/83 at 11.)

Unlike the victims in <u>Rossi</u> and <u>Johnson</u>, however, who were intentionally murdered along with another victim or victims, Ms. McCullough was "not an intended victim of the shooting."   <u>Fierro</u>, 166 Ariz. at 551, 804 P.2d at 83.   Instead, she was a "bystander in the zone of danger during [Petitioner's] murderous act."   <u>Rossi</u>, 146 Ariz. at 366, 706 P.2d at 378.   Ms. McCullough was not an intended victim of Petitioner because Petitioner did not act with the intent to kill her.   <u>See</u> <u>Fierro</u>, 166 Ariz. at 550, 804 P.2d at 83; <u>State v. Gonzalez</u>, 181 Ariz. 502, 514, 892 P.2d 838, 850 (1995).   Instead, Petitioner turned and pointed the gun at her, without firing, after he had shot Mr. West the first time.   (R.T. 6/23/83 at 10-11.)   He then turned away and shot Mr. West again before completing the robbery and exiting the store while Ms. McCullough remained beneath her desk. (<u>Id.</u> at 11-17.)

The Court concludes that a "rational factfinder" could have determined, as the trial court and the Arizona Supreme Court found, that the intended victim of the murder was Mr. West, and that, as Petitioner killed Mr. West, he knowingly placed Ms. McCullough at a grave risk of death pursuant to A.R.S. § 13-703(F)(3).   Therefore, Petitioner is not entitled to habeas relief on this claim.

### EVIDENTIARY DEVELOPMENT

In its Order of July 17, 2000, the Court denied Petitioner's motion for an evidentiary hearing without prejudice.   (Dkt. 74 at 25-26.)   The Court determined that the request had been premature and invited Petitioner to renew such motion in his brief addressing the merits of non-procedurally defaulted claims.   (<u>Id.</u>)   Other than generically requesting permission to utilize the processes of discovery and for the Court to hold an evidentiary hearing to resolve any factual disputes raised by Respondents' Answer, Petitioner did not request evidentiary development of any specific factual issue in his merits brief.   (Dkt. 76 at 48.)   Furthermore, the Court concludes, after reviewing the record, that none of Petitioner's claims warrant evidentiary development because the allegations, even if true, do not entitle Petitioner to habeas relief.

1

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims.  The Court further finds that an evidentiary hearing in this matter is neither warranted nor required.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 27) is **DENIED WITH PREJUDICE.**  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this Order to Noel Dessaint, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007-3329.

DATED this 7th day of July, 2006.

_____
Mary H. Murguia
United States District Judge

- 49 -